150 So.2d 683

**Neva COSTELL et al., Executrices,**

**v.**

**FIRST NATIONAL BANK OF MOBILE et al., Administrators.**

**I Div. 59.**

Supreme Court of Alabama.

Feb. 28, 1963.

Caffey, Gallalee & Caffey, Mobile, for appellants.

McCorvey, Turner, Johnstone, Adams & May, Mobile, for appellees.

MERRILL, Justice.

This appeal is from a final decree granting relief to complainants, who sought to have a constructive trust declared on two parcels of land.

Appellants assign as error that the court erred in overruling the demurrer to the bill of complaint. The only ground of the demurrer was that there was no equity in the bill. Even though complainants prayed for the establishment of a resulting trust instead of a constructive trust, sufficient facts are alleged to show a constructive trust and the general prayer for relief was sufficient to justify the overruling of the general demurrer. White v. Lehman, 210 Ala. 542, 98 So. 780; Shamblee v. Wilson, 233 Ala. 164, 170 So. 769; Hutto v. Copeland, 265 Ala. 482, 92 So.2d 30.

The theory of the bill is that Margaret Cox, a miserly old lady who distrusted banks, had hidden in her home at the time of her death a large amount of currency, some or all of which was stolen by Irene Hurley, a stenographer for the attorney representing the special administrator, while the attorney, the special administrator and the heirs of the decedent were searching Mrs. Cox's home in the hope of finding any such currency. It is then charged that Irene Hurley passed some of the Cox currency to her uncle, W. C. Lantron, who lived in Texas, and that he used this Cox money in buying two parcels of land in Mobile in April, 1935, some seven months after the death of Mrs. Cox.

The First National Bank and The Merchants National Bank of Mobile filed the bill as administrators of the estate of Margaret Cox against Irene Hurley and W. C. Lantron. The bill was filed in January, 1936.

All of the evidence that Irene Hurley stole the money was circumstantial, but it

was nevertheless cogent. Some of the evidence follows.

Margaret Cox was known by her relatives to have gold, bonds and currency in large denominations hidden· somewhere. She had rental property which furnished a good income and she paid all her bills in cash. She had operated a store in her earlier days.

Mrs. Cox died at her home at 4:30 A. M. on September 8, 1934, and the only person with her was Mrs. Roberta Steele, the widow of a nephew of Mrs. Cox. Mrs. Steele had handled the checks and bond coupons for Mrs. Cox for about ten years, cashing them at the bank and giving the cash to Mrs. Cox. She usually got large bills, $100, $50 and $20. Mrs. Cox had $95,000 in bonds, but in April, 1934, some Liberty Bonds were called and Mrs. Steele cashed those and gave her nine $1000 bills. Mrs. Cox kept her currency in a black bag or pocket book. She had several rolls of bills with a string tied around them.

On the morning Mrs. Cox died, Mrs. Steele took the $86,000 in bonds from a hidden drawer and put them in her own bank. That same day, Frank Norden, a nephew of Mrs. Cox, consulted an attorney; told him that money was probably hidden in the house, and the attorney prepared papers to have Norden appointed special administrator. He was so appointed on Saturday and he posted night and day guards outside the house until Monday. On Monday morning he, his three sisters, his attorney and the attorney's secretary, Irene Hurley, entered the house to make a search for hidden money. They found $11,800 in gold coins in the bottom of a wood box by the fireplace. When they took out the wood and turned the box upside down, the gold rolled all over the floor. The coins were piled up in the middle of the bed. They did not find the bonds (Mrs. Steele had them) and they did not find the black bag.

During the search, Irene Hurley said her husband was outside and had never seen that much gold and requested that he be permitted to come in and see it. She was told that he could come to the door of the room and look in. He did so, and Irene handed him a rolled up apron that she had been wearing that day. He took the apron and left. She also brought and carried away a briefcase with her employer's name on it. At this time, Irene Hurley was making $18 per week, was known to be poor, wore inexpensive clothes and her house was in great need of repair.

Shortly after the death of Mrs. Cox, Irene Hurley, her husband and her mother seemed to be much more prosperous. They moved into the house on one of the parcels of land described in the bill, Irene began to flash diamond rings, wear expensive clothes and they had three automobiles. In 1938, Irene and her husband were divorced without any recorded property settlement, but she continued to live well.

In October, 1935, the administrators hired D. N. Harrelson, a private detective, to try to locate the missing currency. He found that Irene Hurley had been spending a considerable amount of money in the seven months following Mrs. Cox's death, that she had moved into a nice home which had been bought by a supposedly rich uncle, W. C. Lantron, from Texas, who claimed to be a millionaire.

Harrelson went to Texas, found that W. C. Lantron looked like a tramp, was living in a two-room shanty in an oil field, was working occasionally for fifty or seventy-five cents a day and his wife "had been on relief." He got Lantron to go with him to the office of the District Attorney in Breckenridge, Texas, and with a deputy sheriff, questioned Lantron. At first, Lantron denied any knowledge of anything concerning Mobile, but he stated orally and in writing that he went to Mobile and purchased a house and lot from the Cotlins for $4500, paying $3000 in cash and promising to pay the balance in a few months without an interest charge. He also purchased a lot for $676 cash. All the money was furnished to him by Irene Hurley. Later, Irene came

to Breckenridge, where Lantron lived, and they drove to Graham and he went into the First National Bank at Graham and got a certified check for $1500, payable to the Cotlins in Mobile (the balance due on the house and lot). He paid for this certified check with a $1000 bill and the rest in hundreds and fifties. He said he insisted on going to Graham because he did not want people in Breckenridge to get suspicious over his having that much money. The banker at Graham, the District Attorney and the deputy sheriff testified by deposition in the case.

The District Attorney also testified that sometime prior to the conference with Lantron at his office, Frank Lantron, a nephew of W. C. Lantron, had been arrested because he had bought an automobile for cash, and since he was a young boy without a job, they questioned him. He told the District Attorney that he had stolen it from his aunt in Mobile (Irene Hurley's mother) "and that she had a lot more money where this came from and that she would never miss it."

Later, Lantron answered interrogatories saying that Irene did not furnish the money and that the money was his own. However, he refused to answer over eighty interrogatories on the grounds that the answer would tend to incriminate him, or subject him to criminal prosecution.

Irene Hurley also refused to answer over one hundred interrogatories because "the same calls for testimony that may tend to subject the respondent to criminal prosecution." Her statement, like Lantron's, was in answer to interrogatories and was made under oath.

■ No resulting trust arises when the title to land is taken in another without the consent of the one who furnishes the purchase money and who is claiming the benefit of a trust. Bostic v. Bryan, 263 Ala. 673, 83 So.2d 796. Of course, Irene Hurley could not acquire title to stolen money, First National Bank of Mobile v. Pope, 270 Ala. 202, 117 So.2d 174, but she could acquire title to the land purchased with the stolen money. These facts show that the true owners of the money did not consent for her to take the money or for her to take title in any real estate for their benefit. Therefore, neither the allegations nor the proof support a resulting trust. But they do show a constructive trust and a proper application of the trust pursuit rule.

■ It is a general rule in most jurisdictions that if the funds of one person are wrongfully used by another in the purchase of real estate in his own name, or in the improvement of his real estate, a constructive trust in the property purchased or improved will arise in favor of the one whose money was wrongfully used, whether the relation at the time of the misuse or misapplication of the funds was a fiduciary one, or that of employer and employee, or whether they stood to each other as strangers; and the beneficiary of the trust so raised is entitled to go into equity and compel a conveyance of the legal title to the property to himself, in the hands of either of the wrongdoer, or of a transferee who does not stand as a bona fide purchaser for value. Ex parte Morton, 261 Ala. 581, 75 So.2d 500; Dillard v. Wheelock, 215 Ala. 195, 110 So. 278; Butts v. Cooper, 152 Ala. 375, 44 So. 616; Johnston v. Little, 141 Ala. 382, 37 So. 592, and additional cases from this state and other jurisdictions cited in 43 A.L.R. 1418(2). See 54 Am.Jur., Trusts, § 247.

■ It is essential to the application of the doctrine of constructive trusts that the property of one be misapplied by another. Fagan v. Whidden, 5th Cir., 57 F.2d 631; First National Bank of Mobile v. Pope, ante, p. 395, 149 So.2d 781.

There is no question but the trust pursuit rule is applied in thief or embezzler cases, and these cases are cited in both the Pope cases, 270 Ala. 202, 117 So.2d 174, and Ala., 149 So.2d 781:[1] Truelsch v. Northwest-

1. Ante, p. 395.

ern Mut. L. Ins. Co., 186 Wis. 239, 202 N.W. 352, 38 A.L.R. 914; Massachusetts Bonding & Ins. Co. v. Josselyn, 224 Mich. 159, 194 N.W. 548; Dayton v. H. B. Claflin Co., 19 App.Div. 120, 45 N.Y.S. 1005; Shaler v. Trowbridge, 28 N.J.Eq. 595; Holmes v. Gilman, 138 N.Y. 369, 34 N.E. 205, 20 L.R.A. 566; Brown v. New York Life Ins. Co., 9 Cir., 152 F.2d 246; Jansen v. Tyler, 151 Or. 268, 49 P.2d 372; Succession of Onorato, 219 La. 1, 51 So.2d 804, 24 A.L.R.2d 656.

■■ We hold that the allegations and the proof show that the two parcels of property were purchased with money stolen by Irene Hurley and the court correctly held that a constructive trust arose in the property in favor of the heirs of Margaret Cox, and that they were entitled to the property purchased with the stolen money.

■ Appellants argue that when Irene Hurley died in October, 1959, the suit was improperly revived because it was revived against the executrices of her estate, a mother and a sister. However, the suit was revived against these two in their representative capacity and against them and another sister as individuals and the only heirs at law and next of kin of Irene Hurley.

Appellants also insist that the court erred in failing to dismiss the cause on account of laches when the appellees sought to revive against them.

■ Timewise, this is an unusual suit. It was filed in January, 1936. Demurrers had been overruled and answers filed by June, 1936. The deposition of the first witness was taken in May, 1937, two witnesses were examined before the court in 1938, and finally in 1940, complainants completed the taking of depositions. Then respondent W. C. Lantron completed his deposition in June, 1943. The cause was not submitted until June, 1951.

The first judge to whom the case was assigned and who heard the first witnesses testify, died in 1945; the judge who succeeded him died in 1956 without deciding the case, and the judge succeeding him died in 1961, and it was still undecided. His successor decided it in August, 1961.

Appellants insist that the cause should have been dismissed for want of prosecution because Equity Rule 68 was not complied with. That rule provides: "When a cause or matter has been submitted for a decree or order, such decree or order must be rendered and filed with the register within four months after the submission, or a resubmission shall be necessary."

We have held that the failure of a court to decide a case within the prescribed four months does not deprive the court of jurisdiction and that a decree rendered later than four months on a resubmission is valid and subject to be affirmed. Tanner v. McClure, 259 Ala. 142, 65 So.2d 709.

The first objection here by respondents on the ground of laches was when the complainants made their motion to revive in 1960. The overruling of respondents' motion to dismiss does not constitute reversible error.

The cause was resubmitted on January 27, 1961, and when the judge died on February 24, 1961, the cause was again resubmitted on June 2, 1961. The final decree was rendered on August 15, 1961, within four months of the last resubmission.

We cannot say that the cause should have been dismissed because of laches, for want of prosecution, or because a resubmission was not had every four months after the cause was submitted and in the breast of the court.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and HARWOOD, JJ., concur.